Thomas P. Smith, Jr.
George N. Stepaniuk
Sushila Rao Pentapati
Peter A. Mancuso
Kiran Patel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0410 (Pentapati)
pentapatisu@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>**-against-**<br><br>**THREE BROTHERS TRADING, LLC d/b/a ALTERNATIVE EXECUTION GROUP,**<br><br>**Defendant.** | **<u>COMPLAINT</u>**<br><br>**26 Civ. 10221**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Three Brothers Trading, LLC d/b/a Alternative Execution Group ("Three Brothers" or "Defendant"), alleges as follows:

## SUMMARY

1. This action concerns a broker-dealer's repeated violations of a basic safeguard designed to help ensure that buyers receive shares they purchase. Before selling shares it does not own, a broker-dealer generally must borrow the shares, arrange to borrow them, or have reasonable grounds to believe they can be borrowed in time for delivery to the buyer. Three Brothers, a registered broker-dealer, repeatedly ignored that safeguard. For more than two years, it sold millions of shares it did not own without satisfying any of these alternatives.

2. Selling shares that the seller does not own is known as "selling short." The pre-sale safeguard described above is known as the "locate requirement" and is codified in Rule 203(b)(1) of Regulation SHO [17 C.F.R. § 242.203(b)(1)] under the Securities Exchange Act of 1934 ("Exchange Act"). The rule also requires the broker-dealer to document its compliance with the locate requirement before making the short sale.

3. From at least April 2021 through October 2023 (the "Relevant Period"), Three Brothers repeatedly sold shares it did not own to buyers in the public market. These sales involved low-priced stocks of companies with small stock-market values, known as "microcap stocks" or "microcap securities." The stocks at issue traded in low volumes and were not readily available to borrow. Before making these sales, Three Brothers neither borrowed shares nor arranged to borrow them from its customers or any other source. It made no inquiry into whether shares could be borrowed in time for delivery to the buyer, and it had no reasonable grounds to believe they could be borrowed.

4. After short selling the shares, Three Brothers purchased the same number of shares from its customers for less than the average price at which it had sold them. The purchases supplied the shares Three Brothers had already sold, and Three Brothers kept the price difference as profit.

5. These later purchases did not cure Three Brothers' failure to satisfy the locate requirement before making its sales. The rule requires a broker-dealer to comply with the locate requirement—by borrowing the shares, entering into a bona fide arrangement to borrow the shares, or having reasonable grounds to believe that the shares can be borrowed—before selling them, even when the broker-dealer expects to purchase shares later.

6. This was not an isolated lapse. During the Relevant Period, Three Brothers repeated this conduct on thousands of occasions across numerous different microcap stocks.

7. Three Brothers also failed to document compliance with the locate requirement before each short sale. That failure independently violated Rule 203(b)(1)(iii), which requires a broker-dealer to document compliance before selling short—not merely to acquire shares afterward to cover the resulting short position.

8. By engaging in this conduct, Three Brothers violated Regulation SHO.

## VIOLATIONS

9. By virtue of the foregoing conduct and as alleged further in this Complaint, Three Brothers violated Rule 203(b)(1) of Regulation SHO [17 C.F.R. § 242.203(b)(1)] under the Exchange Act.

10. Unless Defendant is restrained and enjoined, it will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

12. The Commission seeks a final judgment: (a) permanently enjoining Defendant from violating the federal securities laws this Complaint alleges it has violated; (b) ordering Defendant to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and (c) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14. Defendant, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15. Venue lies in this District under Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For example, certain investors to whom Three Brothers made the short sales at issue were located in the Southern District of New York, and the customer from which Three Brothers purchased a substantial number of shares to cover its short-sale positions was also located in this District.

## DEFENDANT

16. **Three Brothers** is a New York limited liability company organized in 2007 and a broker-dealer registered with the Commission since 2013. Three Brothers has its principal place of business in Bayonne, New Jersey.

## OTHER RELEVANT ENTITIES

17. **Broker-Dealer A** was a broker-dealer registered with the Commission and based in New York, New York. Broker-Dealer A has a history of regulatory failures, and its Commission registration was terminated in March 2023. During the Relevant Period, Broker-Dealer A's business included providing market access to customers seeking to liquidate large volumes of thinly traded, low-priced microcap stocks. Broker-Dealer A was one of Three Brothers' primary broker-dealer customers during the Relevant Period and Three Brothers derived a substantial portion of its revenue from facilitating Broker-Dealer A's stock sales.

18. **Broker-Dealer B** is a broker-dealer registered with the Commission and based in Vancouver, Canada.

19. **Broker-Dealer C** is a broker-dealer registered with the Commission and based in Toronto, Canada.

20. **Issuer 1** is a corporation whose common stock traded on the Over the Counter ("OTC") market during the Relevant Period. Issuer 1's stock was a thinly traded, low-priced microcap security. During the Relevant Period, Three Brothers sold short more than 150 million shares of Issuer 1's stock without performing a locate.

21. **Issuer 2** is a corporation whose common stock traded on the OTC market during the Relevant Period. Issuer 2's stock was a thinly traded, low-priced microcap security. During the Relevant Period, Three Brothers sold short more than 250 million shares of Issuer 2's stock without performing a locate.

22. **Issuer 3** is a corporation whose common stock traded on the OTC market during the Relevant Period. Issuer 3's stock was a thinly traded, low-priced microcap security. During the Relevant Period, Three Brothers sold short more than 600 million shares of Issuer 3's stock without performing a locate.

23. **Issuer 4** is a corporation whose common stock traded on the OTC market during the Relevant Period. Issuer 4's stock was a thinly traded, low-priced microcap security. During the Relevant Period, Three Brothers sold short more than 250,000 shares of Issuer 4's stock without performing a locate.

24. **Issuer 5** is a corporation whose common stock traded on the OTC market during the Relevant Period. Issuer 5's stock was a thinly traded, low-priced microcap security. During the Relevant Period, Three Brothers sold short more than 250,000 shares of Issuer 5's stock without performing a locate.

## RELEVANT TERMINOLOGY

### *Short Selling*

25. Short selling generally means selling shares of a stock that the seller does not own. In a typical short sale, the seller borrows shares and sells them. The seller may pay fees or incur other costs to borrow the shares. The seller later buys an equal number of shares of the same stock to return to the lender in place of the borrowed shares. If the seller pays less for the replacement shares than it received from selling the borrowed shares—*i.e.,* if the share price declines between the short sale and the purchase of replacement shares—the seller earns the difference as gross trading profit, before deducting any borrowing costs or other expenses. Short selling is lawful when conducted in compliance with applicable rules, including the locate requirement codified in Rule 203(b)(1) of Regulation SHO, described below.

26. "Naked" short selling generally refers to selling shares short without having borrowed or located them for delivery to the buyer. Abusive naked short selling can be used to artificially depress a stock's price and harm investors. Naked short selling can also result in "failures to deliver," which occur when the shares sold are not delivered to the buyer by the settlement date.

27. During the Relevant Period, sellers generally had to deliver the shares they sold by the second business day after the sale. This deadline was the "settlement date," and the two-business-day period was known as "T+2."

### *Regulation SHO*

28. The Commission adopted Regulation SHO in 2004, in part, to address potentially abusive naked short selling. A central component is Rule 203(b)(1), known as the "locate requirement." Subject to limited exceptions, this rule prohibits a broker-dealer from selling an equity security for its own account unless, before the sale, the broker-dealer: (i) has borrowed the security or entered into a bona fide arrangement to borrow it, or (ii) has reasonable grounds to believe that the

security can be borrowed in time for delivery to the buyer by the settlement date. *See* 17 C.F.R. § 242.203(b)(1)(i)-(ii). Taking one of these pre-sale steps is commonly referred to as "performing a locate."

29. A broker-dealer must also document its compliance with the locate requirement before making the short sale. *See* 17 C.F.R. § 242.203(b)(1)(iii); *Short Sales*, Exchange Act Release, 69 Fed. Reg. 48,008, 48,014 (Aug. 6, 2004) ("Regulation SHO Adopting Release").

30. Failure to document compliance before the short sale independently violates Rule 203(b)(1)(iii), even if the broker-dealer borrowed the securities, entered into a bona fide arrangement to borrow them, or had reasonable grounds to believe they could be borrowed in time for delivery by the settlement date. *See* 17 C.F.R. § 242.203(b)(1)(i)-(iii).

31. When adopting Regulation SHO, the Commission explained that strong and uniform locate and delivery requirements would reduce short selling abuses and restrict naked short selling. *See* Regulation SHO Adopting Release, 69 Fed. Reg. at 48,009.

32. The Commission also emphasized that "[t]he locate must be made and documented prior to effecting a short sale, regardless of whether the seller's short position may be closed out by purchasing securities the same day." *See* Regulation SHO Adopting Release, 69 Fed. Reg. at 48,014.

33. The locate requirement applies to all equity securities, wherever traded. *See* Regulation SHO Adopting Release, 69 Fed. Reg. at 48,025.

34. Merely receiving a customer's sell order or an unsupported assurance that shares will be delivered does not satisfy the locate requirement. Rather, the broker-dealer must have borrowed the securities, entered into a bona fide arrangement to borrow them, or have reasonable grounds to believe that the securities can be borrowed in time for settlement, and must also have documented its compliance with the locate requirement.

### *Microcap Securities*

35. Microcap securities are stocks issued by companies with low or micro market capitalizations, *i.e.*, the total market value of the company's outstanding shares. These stocks tend to trade at low prices, in low volumes, and are not widely held, and their shares may be difficult to borrow for short selling.

36. When adopting Regulation SHO, the Commission specifically recognized that securities with lower market capitalization "may be more susceptible to abuse." *See* Regulation SHO Adopting Release, 69 Fed. Reg. at 48,025.

37. Many microcap stocks trade in the over-the-counter ("OTC") market rather than on a national securities exchange.

38. Three Brothers traded the securities at issue through OTC Link, an electronic interdealer quotation system. The system allows broker-dealers to post the prices at which they are willing to buy shares ("bids") and sell shares ("offers"). It also displays trading prices and volume and allows broker-dealers to negotiate trades.

### *Bona Fide Market Making Activities*

39. Rule 203(b)(2) of Regulation SHO provides limited exceptions to the requirement that broker-dealers perform and document a locate before making a short sale. [17 C.F.R. § 242.203(b)(2).]

40. One exception applies to "short sales effected by a market maker in connection with bona-fide market making activities in the security for which this exception is claimed." [17 C.F.R. § 242.203(b)(2)(iii).]

41. Exchange Act Section 3(a)(38) [15 U.S.C. § 78c(a)(38)] defines "market maker" to mean "any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who, with respect to a security, holds himself out (by entering quotations in an inter-

dealer communications system or otherwise) as being willing to buy and sell such security for his own account on a regular or continuous basis."

42. Market makers generally provide market liquidity by standing ready to buy and sell a security for their own account, making it easier for other market participants to complete trades.

43. A broker-dealer's status as a market maker does not, by itself, qualify its short sales for the exception to the locate requirement. The exception applies only when the market maker is engaged in bona fide market making in the particular security at the time of the short sale. *See Amendments to Regulation SHO*, Exchange Act Release No. 34-58775, 73 Fed. Reg. 61,690, 61,699 (Oct. 17, 2008) ("Regulation SHO Amendment").

44. Relevant indicators of bona fide market making include actively buying and selling the subject security, regularly and continuously posting widely accessible quotations at or near the market on both sides of the market, and the assumption of economic or market risk. *See* Regulation SHO Amendment, 73 Fed. Reg. at 61,698-99.

45. Bona fide market making "does not include activity that is related to speculative selling strategies or investment purposes of the broker-dealer and is disproportionate to the usual market making patterns or practices of the broker-dealer in that security." *See* Regulation SHO Adopting Release, 69 Fed. Reg. at 48,015.

46. Similarly, where a market maker "posts continually at or near the best offer, but does not also post at or near the best bid," its activities "would not generally qualify as bona-fide market making for purposes of the exception." *See* Regulation SHO Adopting Release, 69 Fed. Reg. at 48,015.

## FACTS

### I. THREE BROTHERS SOLD SHORT MILLIONS OF SHARES OF MICROCAP STOCKS WITHOUT PERFORMING OR DOCUMENTING A LOCATE

47. As a registered broker-dealer, Three Brothers was required to comply with Rule 203(b)(1) of Regulation SHO for every short sale it effected.

48. During the Relevant Period, Three Brothers derived a substantial portion of its revenue from facilitating liquidations of large volumes of thinly traded microcap stocks for Broker-Dealer A and similar broker-dealer customers.

49. These transactions typically followed a similar pattern: Three Brothers received a sell order from its customer for large volumes of a thinly traded, low priced OTC microcap stock. Three Brothers would then sell short into the public market shares of that same microcap stock for its own account, accumulating a short position in that stock. Before those short sales, Three Brothers did not borrow the shares or arrange to borrow the shares that it was selling short for its own account. Nor did Three Brothers conduct any inquiry into whether the shares could be borrowed. The shares of these thinly traded microcap stocks were generally hard to borrow, and Three Brothers lacked reasonable grounds to believe that the shares it was selling short for its own account could be borrowed. Later in the day of the short sale, Three Brothers would then purchase—also on a principal basis for its own account—the same number of shares from its customer but at a price *below* the average price at which it had sold the shares short in the public market.

50. Three Brothers sold short thinly traded microcap stocks for its own account in this manner on thousands of occasions during the Relevant Period, spanning numerous securities and involving millions of shares.

51. For some of those securities, Three Brothers sold short more than 100 million shares without first performing a locate.

52. Three Brothers also did not document its compliance with the pre-sale locate requirement.

53. The following representative examples illustrate Three Brothers' pattern of violations.

## II. THREE BROTHERS SOLD SHORT MORE THAN 150 MILLION SHARES OF ISSUER 1'S STOCK WITHOUT PERFORMING OR DOCUMENTING A LOCATE

54. Issuer 1 is a corporation whose common stock traded on the OTC market during the Relevant Period.

55. From May 2021 through October 2021, Three Brothers received orders from Broker-Dealer A to sell large volumes of Issuer 1 stock.

56. During this period, Issuer 1's stock was a thinly traded, low-priced microcap security that was not readily available to borrow.

57. After receiving Broker-Dealer A's sell orders, Three Brothers sold Issuer 1's shares short for its own account in the public trading market without first borrowing the shares or entering into any arrangement to borrow them.

58. Three Brothers did not inquire into whether shares were available for borrowing for any of these short-sale transactions, and it lacked reasonable grounds to believe that the shares it was selling short could be borrowed in time for settlement.

59. Three Brothers also did not document its compliance with the locate requirement before effecting any of these short sales.

60. From May 2021 through October 2021, Three Brothers executed more than 2,000 short sales of Issuer 1's stock in the manner described in paragraphs 55 and 57 through 59, totaling more than 150 million shares.

61. On each day that Three Brothers sold Issuer 1 shares short for its own account, it purchased the same number of shares from Broker-Dealer A later that day at a price below its average short-sale price. Three Brothers retained the difference as gross trading profit.

62. Three Brothers did not regularly and continuously post quotations to buy and sell shares of Issuer 1 at or near prevailing market prices. Instead, Three Brothers posted offers to sell

Issuer 1 shares at or near the prevailing market price, while posting bids to buy those shares at prices substantially below the prevailing market.

63. By posting bids so far below the prevailing market price, Three Brothers made it unlikely that other market participants would sell shares to Three Brothers at its quoted prices.

64. On October 6, 2021, for example, Three Brothers sold short for its own account 799,992 shares of Issuer 1 stock at $0.002 per share. At the same time, Three Brothers posted bids to buy Issuer 1 shares at just $0.001 per share—approximately half the national best bid.

65. Three Brothers subsequently purchased 799,992 shares of Issuer 1 from Broker-Dealer A at $0.0019 per share. That price was nearly twice the $0.001 bid Three Brothers had publicly posted when it sold the shares short.

66. By effecting more than 2,000 short sales of Issuer 1's stock in the manner described above, including in paragraphs 55 and 57 through 65, Three Brothers violated Rule 203(b)(1) of Regulation SHO.

## III. THREE BROTHERS SOLD SHORT MORE THAN 250 MILLION SHARES OF ISSUER 2'S STOCK WITHOUT PERFORMING OR DOCUMENTING A LOCATE

67. Issuer 2 is a corporation whose common stock traded on the OTC market during the Relevant Period.

68. From July 2021 through February 2022, Three Brothers received orders from Broker-Dealer A to sell large volumes of Issuer 2 stock.

69. During this period, Issuer 2's stock was a thinly traded, low-priced microcap security that was not readily available to borrow.

70. After receiving Broker-Dealer A's sell orders, Three Brothers sold Issuer 2's shares short for its own account into the public trading market without first borrowing the shares or entering into any arrangement to borrow them.

71. Three Brothers did not inquire into whether shares were available for borrowing for any of these short-sale transactions, and it lacked reasonable grounds to believe that the shares it was selling short could be borrowed in time for settlement.

72. Three Brothers also did not document its compliance with the locate requirement before effecting any of these short sales.

73. From July 2021 through February 2022, Three Brothers executed approximately 3,000 short sales of Issuer 2's stock in the manner described in paragraphs 68 and 70 through 72, totaling more than 250 million shares.

74. On each day that Three Brothers sold Issuer 2 shares short for its own account, it purchased the same number of shares from Broker-Dealer A later that day at a price below its average short-sale price. Three Brothers retained the difference as gross trading profit.

75. As with Issuer 1, Three Brothers did not regularly and continuously post quotations to buy and sell shares of Issuer 2 at or near prevailing market prices. Instead, Three Brothers posted offers to sell Issuer 2's shares at or near the market price, while posting bids to buy those shares at prices substantially below the prevailing market.

76. By posting bids so far below the prevailing market price, Three Brothers made it unlikely that other market participants would sell shares to Three Brothers at its quoted prices.

77. Moreover, in some instances, Three Brothers did not post any bid quotes at all for Issuer 2's stock.

78. On October 4, 2021, for example, Three Brothers sold short for its own account 2,476,059 shares of Issuer 2 stock at prices ranging from $0.0022 to $0.0025 per share. At the same time, Three Brothers posted bids to buy Issuer 2 shares at $0.0014—more than 30% below the national best bid.

79. Three Brothers subsequently purchased 2,476,059 shares of Issuer 2 from Broker-Dealer A at prices ranging from $0.0021 per share to $0.0022 per share. That price was approximately 50% more than the $0.0014 bid Three Brothers had publicly posted when it sold the shares short.

80. By effecting approximately 3,000 short sales of Issuer 2's stock in the manner described above, including in paragraphs 68 and 70 through 79, Three Brothers violated Rule 203(b)(1) of Regulation SHO.

## IV. THREE BROTHERS SOLD SHORT MORE THAN 600 MILLION SHARES OF ISSUER 3'S STOCK WITHOUT PERFORMING OR DOCUMENTING A LOCATE

81. Issuer 3 is a corporation whose common stock traded on the OTC market during the Relevant Period.

82. From April 2021 through August 2021, Three Brothers received orders from Broker-Dealer A to sell large volumes of Issuer 3 stock.

83. During this period, Issuer 3's stock was a thinly traded, low-priced microcap security that was not readily available to borrow.

84. After receiving Broker-Dealer A's orders, Three Brothers sold Issuer 3's shares short for its own account into the public trading market without first borrowing the shares or entering into any arrangement to borrow them.

85. Three Brothers did not inquire into whether shares were available for borrowing for any of these short-sale transactions, and it lacked reasonable grounds to believe that the shares it was selling short could be borrowed in time for settlement.

86. Three Brothers also did not document its compliance with the locate requirement before effecting any of these short sales.

87. From April 2021 through August 2021, Three Brothers executed more than 6,500 short sales of Issuer 3 stock in the manner described in paragraphs 82 and 84 through 86, totaling more than 600 million shares.

88. On each day that Three Brothers sold Issuer 3 shares short for its own account, it purchased the same number of shares from Broker-Dealer A later that day at a price below its average short-sale price. Three Brothers retained the difference as gross trading profit.

89. As with Issuer 1 and Issuer 2, Three Brothers did not regularly and continuously post quotations to buy and sell shares of Issuer 3 at or near prevailing market prices. Instead, Three Brothers posted offers to sell Issuer 3 shares at or near the prevailing market price, while posting bids to buy those shares at prices substantially below the prevailing market.

90. By posting bids so far below the prevailing market price, Three Brothers made it unlikely that other market participants would sell shares to Three Brothers at its quoted prices.

91. On August 5, 2021, for example, Three Brothers sold short for its own account 11,244,992 shares of Issuer 3 stock at prices ranging from $0.0012 to $0.0014 per share. At the same time, Three Brothers posted bids to buy Issuer 3 shares at $0.0001 per share—approximately 92% below the national best bid.

92. Three Brothers subsequently purchased 11,244,992 shares of Issuer 3 from Broker-Dealer A at $0.0011 per share. That price was more than ten times as much as the $0.0001 bid Three Brothers had publicly posted when it sold the shares short.

93. By effecting approximately 6,500 short sales of Issuer 3's stock in the manner described above, including in paragraphs 82 and 84 through 92, Three Brothers violated Rule 203(b)(1) of Regulation SHO.

## V. THREE BROTHERS SOLD SHORT MORE THAN 250,000 SHARES OF ISSUER 4'S STOCK WITHOUT PERFORMING OR DOCUMENTING A LOCATE

94. Issuer 4 is a corporation whose common stock traded on the OTC market during the Relevant Period.

95. From March 11, 2022 through March 31, 2022, Three Brothers received orders from Broker-Dealer B to sell large volumes of Issuer 4 stock.

96. During this period, Issuer 4's stock was a thinly traded, low-priced microcap security that was not readily available to borrow.

97. After receiving Broker-Dealer B's sell orders, Three Brothers sold Issuer 4's shares short for its own account into the public trading market without first borrowing the shares or entering into any arrangement to borrow them.

98. Three Brothers did not inquire into whether shares were available for borrowing for any of these short-sale transactions, and it lacked reasonable grounds to believe that the shares it was selling short could be borrowed in time for settlement.

99. Three Brothers also did not document its compliance with the locate requirement before effecting any of these short sales.

100. From March 11, 2022 through March 31, 2022, Three Brothers executed approximately 80 short sales of Issuer 4's stock in the manner described in paragraph 95 and paragraphs 97 through 99, totaling more than 250,000 shares.

101. On each day that Three Brothers sold Issuer 4 shares short for its own account, it purchased the same number of shares from Broker-Dealer B later that day or the next day at a price below its average short-sale price. Three Brothers retained the difference as gross trading profit.

102. As with Issuer 1, Issuer 2, and Issuer 3, Three Brothers did not regularly and continuously post quotations to buy and sell shares of Issuer 4 at or near prevailing market prices.

Instead, Three Brothers posted offers to sell Issuer 4's shares at or near the market price, while posting bids to buy those shares at prices substantially below the prevailing market.

103. By posting bids so far below the prevailing market price, Three Brothers made it unlikely that other market participants would sell shares to Three Brothers at its quoted prices.

104. On March 25, 2022, for example, Three Brothers sold short for its own account 40,000 shares of Issuer 4 stock at prices ranging from $0.52 to $0.53 per share. At the same time, Three Brothers posted bids to buy at $0.37 per share—approximately 30% below the national best bid.

105. Three Brothers subsequently purchased 40,000 shares of Issuer 4 from Broker-Dealer B at $0.518 per share. That price was 40% more than the $0.37 bid Three Brothers had publicly posted when it sold the shares short.

106. By effecting more than 80 short sales of Issuer 4's stock for its own account in the manner described above, including in paragraph 95 and paragraphs 97 through 105, Three Brothers violated Rule 203(b)(1) of Regulation SHO.

## VI. THREE BROTHERS SOLD SHORT MORE THAN 250,000 SHARES OF ISSUER 5'S STOCK WITHOUT PERFORMING OR DOCUMENTING A LOCATE

107. Issuer 5 is a corporation whose common stock traded on the OTC market during the Relevant Period.

108. From February 6, 2023 through February 17, 2023, Three Brothers received orders from Broker-Dealer C to sell large volumes of Issuer 5 stock.

109. During this period, Issuer 5's stock was a thinly traded, low-priced microcap security that was not readily available to borrow.

110. After receiving Broker-Dealer C's sell orders, Three Brothers sold Issuer 5's shares short for its own account in the public trading market without first borrowing the shares or entering into any arrangement to borrow them.

111. Three Brothers did not inquire into whether shares were available for borrowing for any of these short-sale transactions, and it lacked reasonable grounds to believe that the shares it was selling short could be borrowed in time for settlement.

112. Three Brothers also did not document its compliance with the locate requirement before effecting any of these short sales.

113. From February 8, 2023 through February 17, 2023, Three Brothers executed approximately 100 short sales of Issuer 5's stock in the manner described in paragraph 108 and paragraphs 110 through 112, totaling more than 250,000 shares.

114. On each day that Three Brothers sold Issuer 5 shares short for its own account, it purchased a similar number of shares from Broker-Dealer C later that day at a price below its average short-sale price. Three Brothers retained the difference as gross trading profit.

115. On February 8, 2023, for example, Three Brothers sold short for its own account 25,473 shares of Issuer 5 stock at prices ranging from $0.795 to $0.805 per share. Three Brothers subsequently purchased 25,500 shares of Issuer 5 from Broker-Dealer C at $0.792 per share.

116. Three Brothers carried out additional short sales of Issuer 5 stock, and additional purchases of Issuer 5 stock from Broker-Dealer C, on February 9, 2023 and various additional dates through February 17, 2023.

117. Before receiving Broker-Dealer C's orders to sell Issuer 5 stock beginning on February 6, 2023, Three Brothers did not post quotations to buy and sell Issuer 5 stock. Three Brothers began posting those quotations after receiving Broker-Dealer C's orders.

118. In an attempt to make its trading appear to be market making, Three Brothers temporarily posted bid quotations for Issuer 5 stock at or near prevailing market prices.

119. But Three Brothers took steps to discourage other market participants from selling shares to Three Brothers while it was selling Issuer 5 shares short in response to Broker-Dealer C's

orders. On those days, Three Brothers occasionally allowed its bid to reach the national best bid, but then lowered that bid slightly to make purchases from other sellers less likely.

120. Those temporary quotations nevertheless resulted in occasional purchases of small quantities of Issuer 5 stock from sellers other than Broker-Dealer C.

121. After completing its short sales and purchases from Broker-Dealer C on February 17, 2023, Three-Brothers continued posting quotations for Issuer 5 stock. Three Brothers moved its quoted prices to levels that further reduced the likelihood that other market participants would sell shares to it.

122. On March 16, 2023, for example, Three Brothers posted bids to buy Issuer 5 shares at $0.25 per share—approximately 50% below the national best bid.

123. On June 13, 2023, Three Brothers removed its posted quotation to buy Issuer 5 shares.

124. By effecting more than 100 short sales of Issuer 5's stock in the manner described above, including in paragraph 108 and paragraphs 110 through 123, Three Brothers violated Rule 203(b)(1) of Regulation SHO.

## FIRST CLAIM FOR RELIEF
## Violations of Rule 203(b)(1) of Regulation SHO

125. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 124.

126. On thousands of occasions during the Relevant Period, Defendant executed short sales of securities for its own account without having first borrowed the securities, entered into a bona fide arrangement to borrow the securities, or having reasonable grounds to believe that the securities could be borrowed.

127. In addition, in each of these instances, Defendant also did not document compliance with the requirements of Rule 203(b)(1).

128. By reason of the foregoing, Defendant, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Rule 203(b)(1) of Regulation SHO [17 C.F.R. § 242.203(b)(1)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Three Brothers and its agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Rule 203(b)(1) of Regulation SHO [17 C.F.R. § 242.203(b)(1)];

**II.**

Ordering Defendant to pay civil monetary penalties under Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**III.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: New York, New York
November 20, 2026

/s/ Sushila Rao Pentapati
Thomas P. Smith, Jr.
George N. Stepaniuk
Sushila Rao Pentapati
Peter A. Mancuso
Kiran Patel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616

(212) 336-0410 (Pentapati)
pentapatisu@sec.gov